## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

Christopher Hall, on his own behalf              )
and on behalf of his minor child, B.H.           )
701 11th Street NE                               )
Washington, DC 20002                             )
                                                 )
 and                                             )
                                                 )
Piper Hall, on her own behalf                    )
and on behalf of her minor child, B.H.           )
701 11th Street NE                               )
Washington, DC 20002                             )
                                                 )
          Plaintiffs,                            )
                                                 )
v.                                               )      Case No.: 16-2239
                                                 )
South River Restoration, Inc.                    )
1001 Prince Georges Blvd.                        )
Suite 100                                        )
Upper Marlboro, MD 20774                         )      JURY TRIAL DEMANDED
                                                 )
**SERVE:**      Bryan Agee                       )
                South River Restoration, Inc.    )
                1001 Prince Georges Blvd.        )
                Suite 100                        )
                Upper Marlboro, MD 20774         )
                                                 )
 and                                             )
                                                 )
USAA Casualty Insurance Company                  )
9800 Fredricksburg Rd.                           )
San Antonio, TX  78288                           )
                                                 )
**SERVE:**      USAA Casualty Insurance Company )
                c/o CT Corporation               )
                1015 15th Street, NW             )
                Suite 1000                       )
                Washington, DC 20005             )
                                                 )
Defendants.                                      )
_____)

**COMPLAINT**

Christopher Hall, Piper Hall, and their minor child B.H.  (collectively "Plaintiffs" or the "Halls"), through undersigned counsel, file this Complaint against South River Restoration ("South River") and USAA Casualty Insurance Company ("USAA") (collectively "Defendants") and allege and state as follows:

**OVERVIEW**

1.      This is an action against South River for negligence, breach of warranty, negligent infliction of emotional distress, negligent misrepresentation, intentional misrepresentation, and violation of the Consumer Protection Procedures Act of the District of Columbia.  The Halls also allege claims against their homeowners' insurance company, USAA, for negligence and breach of contract.

2.      After Superstorm Sandy caused damage to their residence in the District of Columbia, the Halls undertook efforts to repair their home by contacting USAA and filing a claim.  South River, a general contractor, attempted repairs to their home that caused more damage to the home and its occupants than Superstorm Sandy itself.

3.      USAA insisted that the Halls hire one of its preferred contractors, South River, to do the restoration work, stating it found the estimates from other contractors to be too high. South River's website states that its mission is to "give back what disaster took," but South River's negligence and intentional misconduct have caused a far larger disaster than the Halls ever could have imagined.

4.      In addition, USAA failed in its role to protect the Halls' property rather than cause further damage to it.  What should have been a routine, three-month exterior repair has

turned into four years of faulty workmanship, severe and exacerbated damage to the home, unexplained delays, unresponsive workers, redone work, and—worst of all, the family has been forced to vacate the home as a result of Defendants' actions and inactions that rendered the home uninhabitable and unsafe.

## THE PARTIES

5.      Plaintiffs Christopher and Piper Hall are the parents of minor child B.H.  All Plaintiffs are residents of the District of Columbia, who resided at 701 11th Street NE, Washington, DC 20002.

6.      At the time of the filing of this Complaint, Plaintiffs were living in a temporary rental, a studio basement apartment at 504 12th St. NE, Basement Apt., Washington, DC 20002.

7.      Defendant South River Restoration is a Maryland corporation organized and existing under the laws of the State of Maryland, with its corporate headquarters located at 1001 Prince Georges Blvd., Suite 100, Upper Marlboro, MD 20774.  South River is licensed to do business and is doing business in the District of Columbia.

8.      Defendant USAA is a Texas corporation organized and existing under the laws of the State of Texas, with its corporate headquarters located at 9800 Fredericksburg Road, San Antonio, Texas 78288.  USAA is licensed to do business and is doing business in the District of Columbia.

## JURISDICTION AND VENUE

9.      Subject matter jurisdiction exists by virtue of diversity of citizenship pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, exclusive of interest and costs, and Plaintiffs are citizens of different states than each of the Defendants.

10.      Venue is proper under 28 U.S.C. § 1391, and this Court has personal jurisdiction

over Defendants, because the acts complained of occurred in the District of Columbia, the

property damaged is located in the District of Columbia, and Defendants are licensed to do

business and are doing business in the District of Columbia.

## FACTS COMMON TO ALL CAUSES OF ACTION

11.     Superstorm Sandy swept through the United States East Coast in late 2012.  One

of the areas impacted by the storm was Washington, DC, the location of the Halls' home.  Severe

wind and rain caused damage to the Halls' residence, a single-family home located at 701 11th

Street NE, Washington, DC 20002.

12.     On October 29, 2012, winds from Superstorm Sandy caused a section of the

Halls' parapet wall to fail.  A 25-foot section of brick fell from the house, damaging the second

story roof, the roof above the front door, the steps leading to the front door, and a section of the

patio.  Water from the storm penetrated the inner house in multiple locations (next to the front

door, in the second floor bathroom, second floor office and master bathroom).

13.     The following day, October 30, 2012, the Halls did their best to lay tarps over the

damage done to their parapet wall and bricks.

14.     That day, the Halls also contacted their homeowners' insurer, USAA, to report the

damage and request coverage.

15.     The Halls' home was covered by a homeowners' insurance policy issued by

USAA, with a policy number of CIC 00964 71 95 92A and a policy period of March 25, 2012 to

March 25, 2013 (the "Policy").

16.     The Policy pays for "'sudden and accidental' direct, physical loss" to the Halls'

residence.

17.      In response to the Halls' inquiry, USAA accepted coverage without a reservation

4

of rights.

18.     On November 3, 2012, USAA's representative, Beth Love, visited the Halls' home to examine the damage and provide an estimate for repairs.  Ms. Love drafted an estimate totaling approximately $22,000.

19.     Ms. Love's estimate included: replacing the second story roof; replacing the roof above the front door; and replacing the top 4 feet of brick along the west side of the house, approximately 65 feet long.  The estimate also included an electrical inspection and minor repairs to drywall that had become damaged during the storm.

20.     On November 12, 2012, ServPro visited the Halls' residence and placed multiple blowers and dehumidifiers.

21.     From November 2012 to December 2012, the Halls obtained estimates from contractors to do the work Ms. Love had specified.

22.     The Halls obtained an estimate from Renaissance Development LLC to repair the brick damage.

23.     The Halls obtained an estimate from AA Roofing Company LLC to replace the roof.

24.     The Halls also obtained an estimate from HK Property Management to repair the damage to the inside of their home.

25.     USAA informed the Halls that the estimates it received from Renaissance, AA Roofing, and HK Property Management were too high, and that USAA would not pay them.

26.     Instead, USAA told the Halls to use South River Restoration, a company on USAA's "preferred contractor" list.

27.     From late December 2012 to early January 2013, representatives from South

River Restoration (T.J. Jeffery and Justin Sherbert) visited the Halls' home to explain how South River would repair the damage.

28.     On or about January 8, 2013, the Halls signed a contract with South River Restoration, with the understanding that work would begin approximately three weeks after the contract was signed.

29.     The stated start date under the Contract was on or about January 29, 2013, but South River did not begin work until March 2013.

30.     The Contract stated that South River's work would be substantially completed by April 5, 2013.

31.     Following their inspection, South River Restoration made no adjustments to the original tarp configuration done by the Halls on October 30, 2012, allowing squirrels to nest in the house.

32.     Eventually, after the Halls complained about the squirrels to USAA, USAA forced South River to make proper adjustments to the tarp.

33.     From January 2013 to March 2013, multiple additional storms hit Washington, DC.  Water continued to enter the Halls' home, further damaging the master bedroom and master bathroom and warping the hardwood floor on the second floor.  The first floor below the master bathroom was also damaged by water.  The Halls informed USAA of each of these incidents.

34.     In late March 2013, South River began work to repair the missing and damaged brick on the exterior of the Halls' home.

35.     According to the USAA estimate, the 25-foot section of missing brick was to be replaced as well as a 20-foot section above the master bedroom.

36.     The Halls informed South River's project manager, Patrick Estes, and South

6

River's mason, that the estimate included the entire length of the west side of the house.

37.     Mr. Estes and the mason told the Halls that removing the other sections would cause damage to the bricks below, and that they did not advise removing the brick that was originally scheduled to be removed.  Instead, Mr. Estes and the mason advised that the Halls have the brick repointed.

38.     The Halls paid South River's mason to repoint additional parts of the residence in addition to the damaged portion that was included in the USAA estimate.

39.     Upon information and belief, South River's mason used the wrong type of mortar to repoint the Halls' brick, which caused the mortar to react with the older brick and destroy it as well as damaging the mortar.

40.     South River's mason also attempted to repair the Halls' front steps.

41.     Shortly following South River's mason's attempt to repair the Halls' front steps, the steps crumbled and broke.

42.     In April and May of 2013, South River's roofer, who the Halls now believe to be unlicensed, and known to the Halls only as "Steve," began replacing the Halls' roof.

43.     In April and May 2013, Mr. Estes, South River's project manager, did not address the needed repair to or replacement of the Halls' parapet wall.

44.     In May of 2013, the Halls reached out to USAA and requested a new project manager.  South River then assigned Wallace Brookman as the new project manager.

45.     South River's unlicensed roofer failed to seal the Halls' roof seams properly.

46.     The unsealed roof seams caused further damage and more leaks in the Halls' home.

47.     During April or May of 2013, Joseph Antonelli from South River supervised the

replacement of the Halls' parapet wall.

48.     During April or May of 2013 The Halls supplied South River with the paint color they wanted the exterior of their house to be painted.  Mr. Brookman told the Halls that the house could not be painted, because there was too much rain in the weather forecast.

49.     Also during April and May of 2013, South River began repair work on the interior of the Halls' home.

50.     Plaintiff Piper Hall was pregnant at the time that South River and USAA were working on the repairs to the Halls' home.

51.     During the repair process, the Halls continued to encounter ongoing water issues and a squirrel infestation in their attic.

52.     The Halls requested that the complete ceiling in the master bathroom, the cracked crown molding, and the wall around the doorway to the bathroom be replaced due to water damage and squirrel infestation.

53.     South River, however, only replaced and painted half the ceiling, placed putty over the crack in the crown molding, and painted over the water damage on the wall at the doorway into the bathroom.

54.     South River's mason returned to fix the front steps that failed the first time as well as make corrections to the repair work done on the southwest corner of the Halls' parapet wall.

55.     The Halls made repeated complaints to USAA about the poor quality of South River's work.

56.     During the first week of June of 2013, South River's painter arrived to paint the exterior of the Halls' home.

57.     The directions on the paint cans stated that paint should not be applied if rain is

expected within 24 hours or 24 hours after rain has stopped.

58.     Washington, DC received 2.52 inches of rain on June 6 and 7, 2013.

59.     Despite this, South River's painter applied the paint, and the bottom four feet of the Halls' exterior wall bubbled because the paint could not dry, a condition that any reasonable painter would have anticipated given the weather forecast at that time.

60.     Also in June 2013, South River finished the first round of interior work on the Halls' home, including drywall replacement and replacement of water-damaged flooring on the second floor.

61.     South River painted over water damage on the first floor ceiling and wall below the master bathroom.  South River did not replace the drywall or crown molding on the first floor.  The Halls showed South River an additional leak, but no mitigation was done.

62.     The Halls again complained to USAA that South River was doing a bad job repairing their home.

63.     The Halls suffered severe emotional distress due to the unsafe living conditions that were developing.

64.     On October 10, 2013, Piper Hall was admitted to the hospital and gave birth to stillborn triplets.

65.      The next day the Halls returned from the hospital to find a massive amount of water pouring through the ceiling in their upstairs hallway and in B.H.'s bedroom.

66.     The Halls contacted South River's emergency services department immediately, but the South River employee they spoke to refused to visit the Halls' residence that night and stated he would come the next morning.

67.     All that night, water continued to come through the Halls' ceiling and light

fixtures until the rain stopped.

68.     South River's roofer and another representative visited the Halls' home the next

day to examine the roof.

69.     South River admitted that it had failed to properly seal some of the seams on the

Halls' roof.

70.     South River's representative told the Halls that South River would properly seal

the seams.

71.     Despite the severe leaks, South River did no mitigation work inside the Halls'

residence.

72.     In November 2013, Mr. Jeffery and Mr. Sherbert from South River visited the

Halls' home to seal the area between the flashing around the roof and the brick in the southwest

corner of the home.

73.     In July 2014, the Halls notified South River that there had been more leaks in

their home.

74.     Mr. Sherbert of South River scheduled another roofer to replace the section of the

roof around the parapet wall.

75.     South River's new roofer removed the outer portion of the roof to expose the

parapet wall.

76.     South River's new roofer then discovered that, despite South River's earlier

representations to the contrary, the original damaged parapet wall had never been replaced, as

South River had represented to the Halls would be done, but instead only patched.

77.     South River represented to the Halls that this faulty roof repair job was a major

source of the extensive leaks in the Halls' home.

78.     Mr. Sherbert instructed South River's new roofer to replace the Halls' parapet wall entirely, and to apply the necessary new section of roof.

79.     In August 2014, South River's new roofer left the section of roof that was supposed to be replaced exposed during multiple rainstorms.  Water again entered the Halls' home, into the master bathroom and B.H.'s bedroom.

80.     South River performed no mitigation on the interior areas where the Halls' home was damaged by water.

81.     At this point, the Halls again contacted USAA and expressed their frustration with South River's poor performance and incompetence.

82.     The Halls demanded that USAA select a different restoration contractor to repair their home, but USAA refused.

83.     USAA's representative, Ms. Love, expressed her surprise that the Halls would still be experiencing leaks in their home after so much work had been done by South River.

84.     From December 2014 to January 2015, more leaks and damage occurred to the Halls' home at South River's hands.

85.     During that time period, The Halls heard a leak in B.H.'s bedroom and contacted South River to address it.

86.     In early January, Mr. Sherbert and Dwight Young from South River visited to inspect the roof.

87.     Mr. Sherbert and Mr. Young decided to soak the Halls' roof and chimney with a hose in an attempt to find the latest leak.

88.     When Mr. Sherbert and Mr. Young sprayed the Halls' chimney, water dislodged the mortar around chimney, and even more water entered B.H.'s bedroom.

11

89.     South River did no mitigation for the water that entered the house.

90.     South River then repointed the chimney.

91.     In June 2015, water again streamed into the Halls' home through the recessed lighting in B.H.'s bedroom, as well as through the light fixtures in the upstairs hallway.

92.     South River conducted no mitigation in response to the June 2015 leaks.

93.     The Halls contacted USAA and again demanded a new contractor, stating their exasperation with South River's repeated faulty repairs and their concerns about mold and other physical dangers in the house.  The house smelled musty and inspector from Falcon commented that the upstairs of the home smelled damp as if there was water damage.

94.     USAA told the Halls to continue with South River and that South River's warranty would cover the necessary repairs.

95.     The Halls contacted South River, and Mr. Sherbert and Mr. Young visited their home with a representative from USAA.

96.     South River decided that an engineer was needed to inspect the roof, and asked the Halls' permission for South River to hire an engineer.

97.     Mr. Young informed the Halls that South River, not the Halls, would hire Falcon Engineering.

98.     On multiple occasions, Mr. Young told the Halls that South River would pay for all engineering costs.

99.     South River, not the Halls, signed a contract with Falcon Engineering.

100.     In June 2015, South River also decided to place a tarp on the Halls' roof to prevent future leaks.

101.     South River employees proceeded to nail the tarp to the Halls' roof, creating

12

hundreds of holes in the roof.

102.    Later, Falcon Engineering inspected the roof.  Falcon's June 25, 2015 report found several errors in the roof installation and recommended a complete roof replacement.

103.    In July 2015, the Halls' roof leaked on multiple occasions into B.H.'s bedroom, causing the wood flooring to warp.

104.    During this time there were also numerous leaks in other locations on the second floor.

105.    The Halls notified South River, which indicated that it would come to the residence to take moisture readings.

106.    In addition, Falcon observed cracks in various places in the mortar of the brick section of the Halls' parapet wall which South River had rebuilt.

107.    Based on these cracks, Falcon determined that this rebuilt brick section of the Halls' parapet wall was unstable and needed to be replaced.

108.    Also in July 2015, South River installed scaffolding over the Halls' front door.

109.    During storms that occurred in Washington, DC in August 2015, the positioning of the scaffolding in front of the Halls' home caused water to enter behind the metal flashing around the front door, damaging the framing around the front door as well as the warping the hardwood floor around the front door.

110.    The Halls notified South River and South River taped plastic around the front door.

111.    The Halls continued to suffer from emotional and physical distress due to South River's actions and USAA's inability or refusal to correct the situation.

112.    On September 28, 2015, Piper Hall again experienced a miscarriage.

113.    On September 29, 2015, water yet again entered B.H.'s bedroom and upstairs hallway, creating a large water bubble on the wall.

114.    The Halls notified South River and instead of replacing the tarp, South River used some sort of sealant in an attempt to "repair" the damaged tarp.

115.    In October 2015, water again penetrated the roof and collected in B.H.'s bedroom.

116.    South River sent a mitigation team to the Halls' home.  The team removed damaged drywall from B.H.'s bedroom and placed a dehumidifier.

117.    The Halls again contacted USAA to complain about South River's performance and express their concerns for their family's health and safety.  USAA refused to hire another contractor.

118.    During the summer and fall of 2015, B.H. began experiencing respiratory problems resulting from the poor air quality in his bedroom.  South River had removed part of the ceiling in B.H.'s bedroom, applying only a thin sheet of plastic and exposing B.H. to the poor air quality of the attic.

119.    Due to B.H.'s respiratory problems, in January 2016, the Halls moved him from his old bedroom, which now had multiple leaks, to a new bedroom (the only room thus far undamaged by water) at the opposite end of the house.

120.    In early February 2016, after numerous inspections in which South River and Falcon Engineering gave the Halls' masonry work a passing grade, South River removed a section of the roof to replace the knee wall and the parapet wall.

121.    After the roof section was removed, South River and Falcon realized that the mason had inaccurately installed the required stainless steel rods.  Fixing this issue delayed the project approximately six weeks.

14

122.     During that time, water came through the Halls' ceiling into the second floor office through the area around the roof hatch, damaging the ceiling, the framing around the roof hatch, and the hardwood flooring.  South River sent a mitigation team with blowers and dehumidifiers.

123.     Water also penetrated the B.H.'s new bedroom through the air duct, dripping onto a basket of clothes and damaging the ceiling.

124.     The Halls notified South River, and Mr. Young visited the Halls' home, but no mitigation was performed.

125.     In the beginning of April 2016, streams of water again penetrated through B.H.'s new bedroom, down into the kitchen, and into the basement as well as the office.

126.     South River visited and mitigated the water with drying mats, blowers and dehumidifiers on all three levels of the house.

127.     South River removed drywall from the ceiling and one wall in B.H.'s new bedroom.  South River also removed drywall from the ceiling in the kitchen.

128.     Damage was done to the ceiling, lights, walls, closet, hardwood floor, window frame, bedding and personal effects in B.H.'s new bedroom.

129.     Damage was also done to the ceiling, door frame, lights and hardwood floors in the kitchen.

130.     Finally, in the basement, the walls, joists, and ceiling drywall were damaged.

131.     Mr. Young told the Halls that he instructed his team at South River to re-tarp the Halls' roof,

132.     No one from South River ever came to re-tarp the roof.

133.     At this point, the Halls' home had become uninhabitable because of all the water

15

damage, and the Halls were forced to move to temporary housing.

134.    The Halls notified USAA of their inability to remain in their home.

135.    At the end of April 2016, South River once again removed the Halls' roof.

136.    South River failed to place a tarp or other protection over the roof, leaving the home exposed to animals, intruders, and weather.

137.    The Halls contacted South River to protest this situation.

138.    South River eventually placed a tarp over the roof.

139.    The tarp that South River placed failed, and, again, water penetrated B.H.'s old bedroom on the second floor through light fixtures and the ceiling, causing damage in the bedroom.  Water also entered the home on the first floor through the ceiling and light fixtures, damaging the first floor dining room.

140.    South River had to remove the damaged ceiling and walls in B.H.'s old bedroom.

141.    South River also had to remove damaged parts of the ceiling in the first floor dining room.

142.    The hardwood flooring on the Halls' first and second floor as well as some furniture were damaged by water.

143.    After drying the floor for multiple days, South River employees noted that the floor was warped, and a South River employee told the Halls he would inform Mr. Young at South River of the warped floor.

144.    In the beginning of May 2016, South River removed the small roof above the Halls' front door and placed a tarp over the roof.

145.    At the end of May 2016, the tarp South River placed above the small roof failed, and water again entered the Halls' home.  This caused damage to the drywall, doorframe,

window sill, and hardwood floor.

146.    When the Halls moved their furniture, they noticed mold near the front door. The Halls' home smelled very damp and musty.

147.    The Halls expressed at length to USAA their concerns about the extensive damage to the interior of their home that South River had caused by attempting to repair the exterior.

148.    USAA expressed sympathy with the Halls' desire for South River to complete the exterior work only and pay for, but not work on, the interior damage.

149.    In June 2016, South River repaired the brick work above the Halls' front door, repointing on only the bottom four feet of the Halls' exterior brick.

150.    After South River incorrectly repointed only the bottom four feet of the residence, the Halls protested, because South River's mason had originally spot pointed sections covering the entire home in a faulty manner.

151.    South River refused to order any further repointing.

152.    To date, the faulty repointing has never been rectified.

153.    USAA was aware of the Halls' fruitless efforts to resolve this problem with South River.

154.    Also during June 2016, South River demanded access to the interior of the Halls' home, stating it wanted to complete interior and exterior repairs at the same time.

155.    Given the long history of bad exterior repair resulting in leaks, the Halls were understandably exasperated with South River and, because they were concerned that South River might cause further damage, the Halls refused to allow South River to repair the interior of their home.

156.    The Halls told South River that they had no intention of having any further repairs performed on the interior of their home until it was clear that South River had finally properly repaired the exterior and it would be free of further leaks.

157.    USAA expressed understanding with the Halls' position, but refused to pay for the interior damage South River caused, claiming a policy exclusion precluded coverage.

158.    South River continued to resist the Halls' desire that the exterior repairs be completed prior to further interior repairs.

159.    Also in June 2016, the Halls notified South River that they had received complaints from their neighbors.

160.    The Halls' neighbors had complained that the roofer South River had hired caused damage to a neighbor's roof and air conditioning unit.

161.    The Halls had also been told that their neighbors disliked the presence of scaffolding and workers for nearly four years at the residence.

162.    The Halls are not aware of any response South River made to the neighbors' complaints.

163.    Throughout May and June 2016, South River was minimally responsive to communications from the Halls.

164.    The Halls and their counsel had to contact South River as well as USAA repeatedly to get South River to tarp their roof appropriately to protect it from predicted summer rain while it was being repaired.

165.    In June 2016, South River promised that the metal surrounding the Halls' parapet and front entrance roof would be installed within days, and that the scaffolding would be removed.

18

166.   South River did not even begin the parapet and front entrance roof repairs until mid-July 2016.

167.   At the end of June 2016, The Halls asked South River to pay for additional housing and received no response.

168.   The Halls effectively became homeless until mid-July 2016, when they began renting a basement studio apartment and paying for it on their own in addition to their mortgage payment.

169.   The Halls simply could not risk further exposure to harmful elements.

170.   In early July 2016, South River asked the Halls for access to the interior of their home so that they could bring in a third party to inspect for mold.

171.   In early July 2016, Mr. Young and Mr. Jeffery also inspected the interior and took several measurements, but did not disclose to the Halls any reason for doing so or the results of their inspection.

172.   At this time, South River returned the key to the Halls' home that was given to them.

173.   The Halls believed that South River's return of their house key indicated that South River had no intention of doing any further work on their home.

174.   On June 10, 2016, contractor Modern Remodeling provided an estimate to the Halls to repair the interior damage to their home caused by South River's actions and USAA's inaction.

175.   The June 10, 2016 estimate to repair the interior of the Halls' home was for $103,263.79.

176.   USAA refused to pay for the interior damage caused by South River.

177.    On July 15, 2016, the Halls made formal demand on South River to rectify the interior and exterior damage created by their mistakes.

178.    The Halls' counsel sent a letter itemizing the value of the damage South River had caused that was known as of that date.

179.    South River refused to respond to the letter or to speak with the Halls or their counsel concerning the demand.

180.    After Modern Remodeling provided its estimate, the Halls discovered further damage to their home caused by South River.

181.    On July 18, 2016, Mr. Hall visited the home and spoke with South River's replacement roofer.  The roofer told Mr. Hall that the metal that South River promised in June could not be installed due to mismeasurement on several dimensions.

182.    It was not until July 26, 2016 that South River had the proper metal fabricated.

183.    Mr. Jeffery showed Mr. Hall the original metal flashing and stated he would email a photo and ask the Halls to approve the design for the replacement.

184.    Mr. Jeffery asked the Halls – who are not in the construction business – to approve the design, sending them a photograph by email.

185.    South River told the Halls that the fabrication would not be completed until August 2016.

186.    Also on July 18, 2016, USAA informed the Halls that it would no longer be involved in their claim.

187.    USAA stated its position that it had sufficiently paid for all of the storm damage to the Halls' residence, and any remaining damage was solely caused by South River's negligence and thus was not covered by the Halls' homeowners' insurance policy.

20

188.    USAA issued a check in the amount of $53,246.92 on July 21, 2016.  The check was payable to South River Restoration, the Halls, and Wells Fargo.

189.    On August 12, 2016, Mr. Young and an adjuster from Frontier Management inspected the Halls' residence.

190.    During that inspection, Mr. Young presented the representative from Frontier with an estimate that South River had prepared for repairs to be made inside the Halls' home.

191.    South River has never presented the Halls with Mr. Young's estimate.

192.    At the end of the inspection on August 12, 2016, Mr. Young asked the Halls to endorse the check from USAA.

193.    Mr. Young told the Halls that the scaffolding would be removed on Monday, August 15.

194.    As of the date of this filing, the scaffolding is still standing at the Halls' home despite repeated requested to remove it.

195.    On August 18, 2016, the Halls received a phone call from Mr. Young, again pressing them to endorse the check.

196.    During the August 18, 2016 phone call, Mr. Young told the Halls to "put a bug in USAA's ear about paying for the engineering fees."

197.    South River representatives have pressed the Halls to cosign the USAA check on several occasions, even after being told by the Halls themselves and by their counsel that the Halls would only sign once the work was completed to their satisfaction.

198.    The Halls informed USAA that part of the work apparently included in the July 21, 2016 check was never completed by South River.

199.    USAA sent the Halls a message on August 20, 2016 indicating that USAA would

stop payment on the check and investigate.

200.    USAA has since reissued the check, removing South River as a payee entirely.

201.    On August 11, 2016, South River provided the Halls with the results of the July 2016 mold inspection, which indicated mold damage and interior repairs were needed.

202.    To date, the Halls' front door roof metal and flashing has been installed by South River, but not inspected by Falcon Engineering for proper installation.

203.    On September 9, 2016, South River sent the Halls an invoice for $89,799.65.

204.    $21,967.08 of South River's September 9, 2016 invoice was for "engineering fees."

205.    Upon information and belief, South River contends that $0.00 of its September 9, 2016 bill is work covered by its warranty.

206.    South River has provided no explanation to the Halls why it failed to honor its warranty.

207.    Instead, South River has demanded that the Halls pay for all of South River's faulty work as well as all of South River's work to redo its mistakes.

**COUNT I**
**NEGLIGENCE**
**(South River)**

208.    Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

209.    South River's actions in working on the Halls' home failed to meet the standard for a contractor of ordinary prudence in the same or similar circumstances.

210.    South River held itself out as a "preferred" contractor with USAA, the Halls' homeowners' insurer.

22

211.     South River signed a contract with the Halls and agreed to undertake repairs to their home using at least an ordinary standard of care.

212.     South River provided a warranty to the Halls for the work South River performed on their home.

213.     South River performed acts that a contractor of ordinary prudence in the same or similar circumstances would not have done, including but not limited to:

(a)     Placing nails in the Halls' roof to secure a tarp, creating hundreds of holes that led to leaks;

(b)     Incorrectly measuring components to be installed;

(c)     Improperly installing components;

(d)     Providing incorrect instructions to parties fabricating necessary components for repairing the Halls' roof;

(e)     Applying paint during weather that was too wet according to the instructions on the can;

(f)     Checking for leaks by blasting the Halls' roof and chimney with a hose, damaging the roof and chimney, creating more leaks, and failing to mitigate any water damage caused by this course of action;

(g)     Placing tarps and other weather protection in such a way that rain was allowed to enter the Halls' home;

(h)     Making unilateral decisions to do less than the agreed-upon work, such as sealing rather than replacing a tarp, patching rather than replacing roof elements, and repointing rather than removing damaged brick;

(i)     Improperly placing scaffolding so as to allow rain to enter the Halls'

home; and

(j)      Delaying the repair process in such a way that additional damage occurred.

214.    South River failed to perform acts that a contractor of ordinary prudence in the same or similar circumstances would have done, including but not limited to:

(a)      Failing to place tarps or take other appropriate measures to protect the Halls' home from further weather damage on several occasions;

(b)      Refusing to inspect the Halls' home during rain or other weather that could cause further damage and make sure it was weather tight;

(c)      Leaving surfaces unprotected and exposed to animals, intruders, and weather for extended periods of time;

(d)      Failing to do any work on the home for unreasonable lengths of time and without basis;

(e)      Failing to provide the Halls with any mitigation measures, such as blowers, fans, or dehumidifiers, on several occasions following water damage that South River had caused;

(f)      Failing or refusing to do promised work;

(g)      Unilaterally reducing or compromising the appropriate scope of work;

(h)      Failing or refusing to rectify the poor work of subcontractors after promising to do so;

(i)      Failing to provide appropriate instructions or supervision to subcontractors selected and hired by South River to work on the Halls' home;

(j)      Showing a negligent or reckless disregard for the physical danger posed to

24

the Halls by their damaged home, which eventually became uninhabitable; and

      (k)    Showing a negligent or reckless disregard for the emotional distress suffered by and expressed by the Halls due to the severely damaged nature of their home.

215.    Defendant breached its duty to Plaintiffs to repair their home in a sound and workmanlike manner.

216.    Defendant breached its duty to Plaintiffs to repair their home rather than causing further damage.

217.    Defendant acknowledged its negligence when it agreed to hire, at its own expense, Falcon Engineering to examine and provide guidance on the design necessary to rectify South River's work and properly repair the Halls' home.

218.    South River's acts and omissions caused injury to Plaintiffs and their property, including but not limited to:

      (a)    Damage to the exterior of the Hall residence;

      (b)    Damage to the interior of the Hall residence;

      (c)    Diminution in value of the Hall residence and property;

      (d)    Increased utility bills;

      (e)    Physical injury to the Halls caused by mold and other toxic or irritant elements introduced into the Halls' home by South River's actions and inactions;

      (f)    Physical injury to the Halls caused by stress resulting from South River's conduct;

      (g)    Loss of use of the property surrounding the Hall residence;

      (h)    Loss of use of the Hall residence;

      (i)    Emotional distress to the Halls; and

(j)     Fear of further physical injury from the damaged nature of the residence, causing the Halls to move out and incur significant expense to live elsewhere.

219.    Plaintiffs have suffered damages in an amount to be proved at trial.

## COUNT II
## BREACH OF EXPRESS WARRANTY
### (South River)

220.    Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

221.    South River's Contract provided the Halls with a Five Year Warranty, stating in pertinent part, "South River Restoration provides a 5-year workmanship warranty."

222.    South River's work failed to meet a reasonable standard of workmanship.

223.    South River's actions in failing to repair and causing further damage to the Halls' home constitute breach of the express warranty South River provided to the Halls.

224.    Plaintiffs have suffered damages as a result of South River's breach in an amount to be proved at trial.

## COUNT III
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (South River)

225.    Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

226.    South River delayed, mismanaged, and failed to show the adequate standard of care in repairing the Halls' home.

227.    Representatives of South River showed callous disregard for the Halls' need for weathertight shelter, refusing on some occasions to even visit the residence to remediate the damage.

26

228.     South River repeatedly demanded payment to which it was not entitled.

229.     The damage South River caused resulted in physical injury to the Halls' minor child, B.H.

230.     The damage South River caused resulted in physical injury to Piper Hall, including a miscarriage and a stillbirth.

231.     Because of the damage South River caused, the Halls feared for their own safety in the danger zone their house had become, and moved out on April 7, 2016.

232.     Plaintiffs have suffered severe emotional distress, as manifested in several traumatic medical events.  This distress has damaged the Halls in an amount to be proved at trial.

## COUNT IV
## NEGLIGENT MISREPRESENTATION
### (South River)

233.     Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

234.     South River misrepresented that it had performed certain work on the Halls' home when, in fact, that work had not been performed.

235.     In particular, South River represented to the Halls that their home was repaired in a workmanlike manner; that their roof had been replaced properly, that the parapet wall had been replaced when it had only been patched; and that their exterior brick had been successfully repointed when it had not.

236.     The Halls relied to their detriment on these representations when they permitted South River to continue working on their house.

237.     South River knew of the Halls' reliance on South River's representations.

238.     South River's continued work caused even more damage.

27

239.     South River represented that the subcontractors it hired would be licensed, which was not the case.

240.     The Halls relied to their detriment on these representations when they allowed South River and the subcontractors to continue working on their home.

241.     South River knew of the Halls' reliance on South River's representations.

242.     South River and its subcontractors' continued work caused even more damage.

243.     South River repeatedly represented to the Halls that South River would accept responsibility for Falcon Engineering's charges relating to the Hall residence.

244.     As South River acknowledged, Falcon's work was only made necessary because of the mistakes of South River and its subcontractors.

245.     The Halls relied to their detriment on South River's representations concerning Falcon when the Halls permitted Falcon to conduct engineering work on their home.

246.     South River knew of the Halls' reliance on South River's representations.

247.     On September 9, 2016, South River sent the Halls a bill including $21,967.08 for "engineering fees."

248.     Plaintiffs have suffered damages as a result of South River's negligent misrepresentation in an amount to be proved at trial.

## COUNT V
## INTENTIONAL MISREPRESENTATION
### (South River)

249.     Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

250.     South River misrepresented that it had performed certain work on the Halls' home when, in fact, that work had not been performed.

28

251.     In particular, South River represented to the Halls that their home was repaired in a workmanlike manner; that their roof had been replaced properly; that the parapet wall had been replaced when it had only been patched; and that their exterior brick had been successfully repointed when it had not.

252.     At the time South River made these representations to the Halls, it either knew or showed a reckless disregard for gathering the proper knowledge that the Halls' home had not been repaired properly.

253.     The Halls relied to their detriment on South River's representations when they permitted South River to continue working on their house.

254.     South River knew of the Halls' reliance on South River's representations.

255.     South River's continued work caused even more damage.

256.     South River represented that the subcontractors it hired would be licensed, which was not the case.

257.     At the time South River made these representations to the Halls, it either knew or showed a reckless disregard for gathering the proper knowledge concerning the licensing of its subcontractors.

258.     The Halls relied to their detriment on these representations when they allowed South River and the subcontractors to continue working on their home.

259.     South River knew of the Halls' reliance on South River's representations.

260.     South River and its subcontractors' continued work caused even more damage.

261.     South River repeatedly represented to the Halls that South River would accept responsibility for Falcon Engineering's charges relating to the Hall residence.

262.     As South River acknowledged, Falcon's work was only made necessary because of the mistakes of South River and its subcontractors.

263.     At the time South River made these representations to the Halls, it had no intention of paying Falcon Engineering.  Instead, South River planned to bill the Halls for Falcon's work.  South River used its representations to induce the Halls into allowing South River to hire Falcon.

264.     The Halls relied to their detriment on South River's representations concerning Falcon when the Halls permitted Falcon to conduct engineering work on their home.

265.     South River knew of the Halls' reliance on South River's representations.

266.     On September 9, 2016, South River sent the Halls a bill including $21,967.08 for "engineering fees."

267.     Plaintiffs have suffered damages as a result of South River's intentional misrepresentation in an amount to be proved at trial.

## COUNT VI
## VIOLATION OF CONSUMER PROTECTION PROCEDURES ACT
## OF THE DISTRICT OF COLUMBIA
### (South River)

268.     Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

269.     South River's actions are in violation of the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3904 et seq.

270.      In particular, South River "represent[ed] that . . . services ha[d] . . . characteristics [and] benefits . . . that they do not have," including, but not limited to, representing to the Halls that their home was repaired in a workmanlike manner; representing to the Halls that their roof

had been replaced when it had only been patched; and representing to the Halls that their exterior brick had been successfully repointed when it had not.  See D.C. Code § 28-3904(a).

271.    South River represented that the subcontractors it hired would be licensed, which was not the case.  See D.C. Code § 28-3904(b).

272.    South River represented that the services it provided in repairing the Halls' home and were of good standard and quality, when in fact they were not.  See D.C. Code § 28-3904(d).

273.    South River misrepresented several material facts that had a tendency to mislead, including but not limited to:  assuring the Halls that their roof would be repaired in a workmanlike manner; assuring the Halls that South River would pay for Falcon Engineering's charges; and assuring the Halls that the repairs to the home's brick and stairs would be completed in a workmanlike manner.  See D.C. Code § 28-3904(e).

274.    South River failed to state material facts that had a tendency to mislead the Halls, including but not limited to:  failing to notify the Halls of South River's belief that more than $89,000 of the work being done was outside South River's five-year warranty; failing to notify the Halls that its subcontractor(s) were unlicensed; failing to notify the Halls why South River undertook repeated inspections and measurements of the interior of the Halls' home.  See D.C. Code § 28-3904(f).

275.    South River falsely represented that repairs had been made to the Halls' home and received remuneration therefor, when it turned out such repairs had not been properly made.  See D.C. Code § 28-3904(p).  In fact, South River has demanded payment prior to repairs being completed, with full knowledge of the incompleteness of the repairs.

276.    South River represented to the Halls that it would repair their home in a workmanlike manner.

277.    Instead, South River delayed, mismanaged, and failed to show the adequate standard of care in repairing the Halls' home.

278.    South River's actions caused the Halls' home to become uninhabitable.

279.    South River has attempted to charge the Halls for South River's costs to repair its own work.

280.    The Halls have a private right of action under the CPPA.  See D.C. Code § 28-3905(k).

281.    Plaintiffs have suffered damages as a result of South River's actions in an amount to be proved at trial.

## COUNT VII
## UNJUST ENRICHMENT
### (South River)

282.    Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

283.    South River agreed to repair the damage to the Halls' home caused by Superstorm Sandy.

284.    The Halls, by way of their insurance policy with USAA, have already provided significant funds to South River, which South River kept and continues to possess.

285.    South River failed to complete the necessary work for four years, causing additional damage to the interior and the exterior of the Halls' home.

286.    The Halls must undertake a large-scale renovation of the interior of their home because of the damage that South River caused.

287.    For its work on the Halls' home, South River has been paid far in excess of the worth of the work it performed.

288.    South River's actions have made it necessary for the Halls to expend significant funds to repair the interior of their home.

289.    South River owes much more to the Halls for interior damage than South River received from USAA under the Halls' insurance policy.

290.    Retention of the significant insurance funds by South River is not equitable under the circumstances.

291.    This unjust enrichment has resulted in damages to Plaintiffs in an amount to be determined at trial.

## COUNT VIII
## BREACH OF CONTRACT
## (USAA)

292.    Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

293.    Pursuant to the Policy, USAA agreed to pay for "'sudden and accidental' direct, physical loss" to the Halls' residence.

294.    The Halls sought assistance from USAA after their home was damaged by Superstorm Sandy.

295.    USAA and the Halls agreed on the initial scope of repairs.

296.    USAA refused to pay for the initial contractors the Halls selected.

297.    USAA told the Halls that USAA would pay if the Halls hired South River to do the work.

298.    USAA has designated South River as one of its "preferred contractors."

299.    South River failed to complete the necessary work for four years, causing additional damage to the interior and the exterior of the Halls' home.

300. The Halls repeatedly complained to USAA about South River's poor performance and the additional damage South River caused to their home.

301. The Halls repeatedly asked USAA for a replacement contractor.

302. USAA repeatedly refused.

303. USAA has refused to reimburse the Halls for the damage caused by South River.

304. The Halls have met all of their obligations under the Policy, including but not limited to timely notifying USAA of the loss.

305. No exclusions under the Policy apply to bar the Halls' losses.

306. By engaging in the conduct described above, USAA has breached its duties to the Halls under the terms and conditions of the Policy.

307. USAA's conduct is also a breach of the duty of good faith and fair dealing that is inherent in all District of Columbia contracts.

308. USAA's breach has damaged Plaintiffs in an amount to be proved at trial.

## COUNT IX
## NEGLIGENCE
## (USAA)

309. Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

310. As its homeowners' insurer, USAA owed a duty to the Halls to act reasonably in coordinating and paying for the damage to the Hall residence caused by Superstorm Sandy.

311. Upon information and belief, South River has a history of complaints concerning its performance as a contractor.

312. USAA has designated South River as one of its "preferred contractors."

313. USAA's actions failed to meet the standard for an insurer of ordinary prudence in

the same or similar circumstances.

314.    USAA performed acts that an insurer of ordinary prudence in the same or similar

circumstances would not have done, including but not limited to:

(a)    Refusing to approve the estimates the Halls obtained from reputable local

contractors;

(b)    Including South River on its list of "preferred contractors";

(c)    Requiring the Halls to hire South River as a condition of USAA's payment

under its policy;

(d)    Requiring the Halls to continue to work with South River after repeated

mistakes and damage to their home; and

(e)    Issuing payment to South River for incomplete or incorrectly performed

repair work.

315.    USAA failed to perform acts that an insurer of ordinary prudence in the same or

similar circumstances would have done, including but not limited to:

(a)    Failing to conduct reasonable diligence about South River before

designating South River one of USAA's "preferred contractors";

(b)    Failing to conduct reasonable diligence about South River before insisting

that the Halls hire South River to repair the damage to their home;

(c)    Failing to replace South River at any of the multiple points when the it

became obvious, through physical evidence and reports from the Halls that South River was

causing severe damage to the Halls' residence;

(d)    Failing to take financial responsibility for the damage caused by South

River, USAA's "preferred contractor";

(e)      Failing to provide appropriate instructions or supervision to South River and its workers;

(f)      Showing a negligent or reckless disregard for the physical danger posed to the Halls by their damaged home, which eventually became uninhabitable; and

(g)      Showing a negligent or reckless disregard for the emotional distress suffered by and expressed by the Halls due to the severely damaged nature of their home.

316.    USAA breached its duty to Plaintiffs to provide insurance that would return their home to the state it was in before it was damaged by the storm.

317.    USAA breached its duty to Plaintiffs to repair their home rather than causing further damage.

318.    USAA acknowledged its negligence when it acknowledged, at repeated points, how severe the damage was that South River caused to the Halls' residence.

319.    USAA's acts and omissions caused injury to Plaintiffs and their property, including but not limited to:

(a)      Damage to the exterior of the Hall residence;

(b)      Damage to the interior of the Hall residence;

(c)      Diminution in value of the Hall residence and property;

(d)      Increased utility bills;

(e)      Physical injury to the Halls caused by mold and other toxic or irritant elements introduced into the Hall's home by South River's actions and inactions;

(f)      Physical injury to the Halls caused by stress resulting from South River's conduct;

(g)      Loss of use of the property surrounding the Hall residence;

36

(h)     Loss of use of the Hall residence;

(i)     Emotional distress to the Halls; and

(j)     Fear of further physical injury from the damaged nature of the residence,

causing the Halls to move out and incur significant expense to live elsewhere.

320.    Plaintiffs have suffered damages in an amount to be proved at trial.

## COUNT X
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (USAA)

321.    Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

322.    USAA failed to show the adequate standard of care in its selection and recommendation of South River to repair the Halls' home.

323.    South River repeatedly demanded payment to which it was not entitled.

324.    The damage South River caused resulted in physical injury to the Halls' minor child, B.H.

325.    The damage South River caused resulted in physical injury to Piper Hall, including a miscarriage and a stillbirth.

326.    Because of the damage South River caused, the Halls feared for their own safety in the danger zone their house had become, and moved out on April 7, 2016.

327.    Plaintiffs have suffered severe emotional distress, as manifested in several traumatic medical events.  This distress has damaged the Halls in an amount to be proved at trial.

## COUNT XI
## NEGLIGENT MISREPRESENTATION
### (USAA)

328.     Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

329.     As its homeowners' insurer, USAA owed a duty to the Halls to act reasonably in coordinating and paying for the damage to the Hall residence caused by Superstorm Sandy.

330.     USAA represented to the Halls that South River was a "preferred contractor," implying that South River had a good reputation and would repair the Halls' home in a workmanlike manner.

331.     The Halls relied on USAA's representation when they hired South River to repair their home.

332.     USAA knew that the Halls were relying on its representations, because the Halls had previously attempted to hire different contractors to repair their home.

333.     USAA refused to pay for the other contractors the Halls selected.

334.     USAA insisted that the Halls hire South River for the work to be paid under the Policy.

335.     Upon information and belief, South River has a history of complaints concerning its performance as a contractor.

336.     As discussed above, South River's work severely damaged the Halls' home.

337.     Plaintiffs have suffered damages as a result of South River's negligent misrepresentation in an amount to be proved at trial.

## COUNT XII
## VIOLATION OF CONSUMER PROTECTION PROCEDURES ACT
## OF THE DISTRICT OF COLUMBIA
## (USAA)

338.     Plaintiffs reallege and incorporate the allegations of all preceding paragraphs as if fully set forth herein.

339.     USAA's actions are in violation of the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3904 et seq.

340.      In particular, USAA "represent[ed] that . . . services ha[d] . . . characteristics [and] benefits . . . that they do not have," including, but not limited to, its designation of South River as a "preferred contractor" and its insistence that the Halls hire South River to repair their home, which indicated to the Halls that South River would repair their home was repaired in a workmanlike manner.  See D.C. Code § 28-3904(a).

341.     USAA represented that the services South River would provide in repairing the Halls' home would be of good standard and quality, when in fact they were not.  See D.C. Code § 28-3904(d).

342.     USAA misrepresented several material facts that had a tendency to mislead, including but not limited to South River's reputation and quality of its work.  See D.C. Code § 28-3904(e).

343.     USAA failed to state material facts that had a tendency to mislead the Halls, including but not limited to South River's poor reviews, bad reputation, and previous experiences with poor workmanship.  See D.C. Code § 28-3904(f).

344.     USAA represented to the Halls that South River would repair their home in a workmanlike manner.

345.     Instead, South River delayed, mismanaged, and failed to show the adequate standard of care in repairing the Halls' home.

346.     The actions of USAA and South River caused the Halls' home to become uninhabitable.

347.     The Halls have a private right of action under the CPPA.  See D.C. Code § 28-3905(k).

348.     Plaintiffs have suffered damages as a result of USAA's actions in an amount to be proved at trial.


WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order

A.     On Count I, entering judgment against Defendant South River and in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, and costs, as appropriate;

B.     On Count II, entering judgment against Defendant South River and in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, and costs, as appropriate;

C.     On Count III, entering judgment against Defendant South River and in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, and costs, as appropriate;

D.     On Count IV, entering judgment against Defendant South River and in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest,

fees, and costs, as appropriate;

E.      On Count V, entering judgment against Defendant South River and in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, punitive damages, and costs, as appropriate;

F.      On Count VI, entering judgment against Defendant South River and in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, punitive damages, and costs, as appropriate;

G.      On Count VII, entering judgment against Defendant South River and in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, and costs, as appropriate;

H.      On Count VIII, entering judgment against Defendant South River and in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, and costs, as appropriate; and

I.      On Count IX, entering judgment against Defendant USAA and in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, and costs, as appropriate; and

J.      On Count X, entering judgment against Defendant USAA in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, and costs, as appropriate;

K.      On Count XI, entering judgment against Defendant USAA in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, and costs,

as appropriate; and

L. On Count XII, entering judgment against Defendant USAA in favor of Plaintiffs in an amount to be determined at trial, plus prejudgment and postjudgment interest, fees, punitive damages, and costs, as appropriate; and

M. On all Counts, granting Plaintiffs such other and further relief as is just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated: November 11, 2016   Respectfully submitted,

       TAYMAN LANE CHAVERRI LLP

       ___/s/_____
       Erin L. Webb (Bar No. 482018)
       David Lee Tayman (Bar No. 493244)
       Katie Lane Chaverri (Bar No. 502976_
       Tayman Lane Chaverri LLP
       1875 Eye Street, N.W.
       Fifth Floor
       Washington, D.C. 20006
       Tel:  (202) 695-8124
       Fax:  (202) 478-2781
       ewebb@tlclawfirm.com
       dtayman@tlclawfirm.com
       kchaverri@tlclawfirm.com

       *Attorneys for Plaintiffs*